UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Beverly Barbour,** | ) | **CASE NO. 1: 11 CV 110** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Household Life Insurance** | ) | |
| **Company,** *et al.*, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

This removed diversity case concerns a joint group life insurance policy. Pending before the Court is Defendants' Motion for Summary Judgment (Doc. 30) on plaintiff's bad faith claim.[1] For the reasons stated below, defendants' motion is granted.

**Facts and background**

The following facts are not in dispute. On April 24, 2008, plaintiff Beverly Barbour

---

[1] Plaintiff's Motion for Summary Judgment for Breach of Contract Against Defendant Household Life Insurance Company (Doc. 22) is being held in abeyance as the parties have represented that they are in the process of settling plaintiff's breach of contract claim.

1

(plaintiff) and her husband, the now deceased Larry Barbour, purchased a joint credit life insurance policy (the policy) from defendant Household Life Insurance Company (HLIC). The policy was intended to insure repayment of a mortgage loan extended to the Barbours by defendant Household Realty Corporation (HRC) in the event that either of the Barbours passed away.  The policy provides that when either of the Barbours dies, policy benefits are payable to HRC to the extent of the then-existing balance on the Barbour's mortgage loan, up to a maximum benefit of $150,000.

On April 24, 2008, plaintiff and her husband completed the application for the policy. The application asked the Barbours:

> Have your ever been diagnosed by a member of the medical profession as having (1) high blood pressure, (2) cancer or tumor, (3) AIDS (Acquired Immune Deficiency Syndrome) or an ARC (Aids Related Complex), (4) heart disease, (5) stroke, (6) diabetes, (7) drug or alcohol related condition; and disease or disorder of the (8) digestive system, (9) lungs, (10) kidneys, (11) liver, or (12) blood (other than AIDS)?

The Barbours both answered "yes" to this question and indicated on their application that they had both been diagnosed with hypertension.  The Barbours disclosed on their application the medications they were prescribed, their medication dosages, and the names of their physicians.  In addition, the Barbours authorized "any licensed physician, medical practitioner, hospital, clinic or other medically related facility" to give HLIC "records or knowledge of [the Barbours] or [their health], so that [HLIC] can determine [their] eligibility for insurance."

Question 4 of the application asked the Barbours:  "Within the last 10 years, have you ever been told by a member of the medical profession that you have or had a disease or disorder of the . . . mental or nervous system?"  The Barbours both answered no to this

2

question.

HLIC's corporate representative and underwriting consultant, Sherry Zelichowski, testified that HLIC generally makes determinations on applications for credit life insurance based on "the answers that are provided on the application, and any additional information that [is gathered] during the underwriting process, such as writing letters or speaking with the customer."  (Zelichowski Dep., p. 43.)  In addition, Zelichowski testified that HLIC uses Medical Information Bureau (MIB) to gather relevant medical information about applicants.  MIB is a nonprofit organization database of information "that is collected on applicants who have applied to member companies, and if a company . . . is part of this group, or a member of this group, they have the ability to request information from the MIB, and the MIB will provide any information that they may have in their database."  (*Id*. at p. 44.)  As part of its underwriting investigation, HLIC submitted a query about the Barbours to MIB.  The MIB query returned an "MIB try" indicating that Larry Barbour had been diagnosed with "alcohol use significant to health and longevity" that occurred "at some indefinite time in the past."  The "try" indicated that this information was "suspected information obtained from licensed physicians or medical practitioners, hospitals, clinics, or other medical or medically-related facilities."  (Def. Mem. at 4, citing Zelichowski Dep. at 72-73.)  Because MIB categorized the information about Mr. Barbour as "suspected" and did not indicate that Mr. Barbour had an alcohol related condition with certainty, HLIC's underwriting procedures required that it investigate further rather than deny coverage to the Barbours outright.

Zelichowski testified that HLIC's policy for investigating an "MIB try" indicating a suspected medical issue is to "write back to [the] applicant] questioning whether or not there

was some information that may have not been admitted on the application." (Def. Mem. at 4, citing Zelichowski Dep. at 76.) She testified that HLIC is prevented from asking the applicant specific questions about the particular condition the applicant is suspected of having due to "polices set by the non-profit that provides the MIBs and privacy concerns for individuals that may be mistaken for an applicant." Thus, Zelichowski testified that, in accordance with HLIC's procedures, HLIC wrote to the Barbours on May 5, 2008, asking them to "please advise if [they were] being treated for a medical condition other than high blood pressure." (May 5, 2008 letter, attached as Ex. C. Def. Mot.) The Barbours responded that there were no other conditions for either of them. (Def. Mot., Ex. D.)

HLIC issued the policy to the Barbours based on the information provided by the Barbours. HLIC did not contact Mr. Barbour's physician prior to issuing the policy, or after it received the "MIB try."

Larry Barbour died from a heart attack on March 31, 2010, caused by atherosclerotic cardiovascular disease. Plaintiff submitted a claim to HLIC for benefits under the policy. Because the claim fell within the policy's two-year contestability period, HLIC investigated the claim. Research Service Bureau obtained documents necessary to investigate plaintiff's claim on behalf of HLIC. Research Service Bureau requested Mr. Barbour's medical records and contacted plaintiff to obtain a statement. (Zelichowski Dep. at 89.)

Mr. Barbour's medical records for the period from October 19, 2001 through February 16, 2010, were obtained from the Cleveland Clinic. These records indicate that Mr. Barbour's physician, Dr. Anita Misra-Hebert, had diagnosed Mr. Barbour with "alcohol-abuse– unspecified" on multiple occasions. The "alcohol-abuse– unspecified" diagnosis was

4

first recorded on notes pertaining to a visit by Mr. Barbour to Dr. Misra-Hebert on January 24, 2002. Notes from the January 24th visit state: "EtoH [alcohol use of] 12 pack beer/d for past 2-3 yrs." The notes also indicate that Mr. Barbour answered "yes to CAGE questions 4/4." The CAGE questions Mr. Barbour answered in the affirmative are used as a screening tool for determining whether excessive alcohol use may be an issue for a patient and include: (1) Have you ever tried to Cut down on your drinking?; (2) Has anyone ever expressed that they're Annoyed about your drinking?; (3) Have you ever felt Guilty about how much you drink?; and (4) Have you ever had an Eye-opener, meaning a drink first thing in the morning? (*See* Misra-Hebert Dep. at 15.) The notes indicate a diagnosis of "ALCOHOL ABUSE- UNSPEC" and that Dr. Misra-Hebert "discussed at the length the importance of quitting: pt states he will try on his own."

An "alcohol abuse- unspecified" diagnosis also appeared in medical records pertaining to subsequent visits by Mr. Barbour to Dr. Misra-Hebert. Notes from Mr. Barbour's February 21, 2003 visit to Dr. Misra-Hebert state that Mr. Barbour "decreased ETOH-drinks about 3 cans beer/s." The notes from this visit list "ALCOHOL ABUSE- UNSPEC" as a diagnosis and also state that Dr. Misra-Hebert recommends "decreasing ETOH use further."

Notes from a June 26, 2003 visit list the same alcohol abuse- unspecified diagnosis and note under "Alcohol Use" that Mr. Barbour drinks a six pack per day and "has actually cut down from previous."

Notes from four other subsequent occasions (August 18, 2003, September 24, 2003, April 19, 2004, and February 27, 2006) also reference an "alcohol abuse unspecified"

diagnosis for Mr. Barbour.

After receiving these records, HLIC's claims examiner, Christine Amerspek, consulted Ms. Zelichowski to determine what HLIC's underwriting decision would have been in the Barbour's case had Mr. Barbour revealed in the insurance application the information contained in the medical records. Ms. Zelichowski responded that the underwriting department would have declined the Barbour's application if they had known that Mr. Barbour had been diagnosed with an alcohol related condition. (Zelichowski Dep. at 99, 105, 1-7; Exh. 16.)

On October 4, 2010, HLIC sent a letter to plaintiff denying her claim for benefits under the policy. HLIC's denial letter stated that its investigation revealed that Mr. Barbour had been treated for an "alcohol related condition" on January 24, 2002, February 21, 2003, June 26, 2003, August 18, 2003, April 9, 2004, and February 27, 2006, and that Mr. Barbour did not indicate that he had been treated for an alcohol related condition on the Barbour's life insurance application. HLIC's letter stated that Mr. Barbour's health history discovered during HLIC's investigation was material to the risk insured and that HLIC would have declined Mr. Barbour for coverage had he disclosed his medical history. HLIC's letter notified plaintiff that her claim was denied, that coverage under the policy was rescinded, and that the policy was void.

Plaintiff filed this lawsuit against HLIC and HRC in the Cuyahoga County Court of Common Pleas on December 2, 2010, seeking a declaration that HLIC is obligated to pay plaintiff benefits under the policy and asserting damage claims against HLIC for breach of

6

contract and bad faith.[2]

Plaintiff filed a motion for summary judgment on the breach of contract claim on October 31, 2011 (Doc. 22), arguing that she is entitled to summary judgment because an insurer may not rely on misstatements in a life insurance application to deny coverage under Ohio law unless the insurer clearly and convincingly proves that the applicant willfully and fraudulently supplied a false statement, and HLIC has no evidence that Mr. Barbour knew about his "alcohol abuse" diagnosis such that he could have committed fraud in failing to disclose it.[3]

After plaintiff's motion for summary judgment was filed, HLIC deposed Dr. Misra-Hebert (on December 21, 2011). Dr. Misra-Hebert testified that she diagnosed Mr. Barbour with "alcohol- abuse- unspecified" and that she discussed Mr. Barbour's alcohol use with him. (Dep. of Dr. Misra-Hebert, at 17, 22-25.) While Dr. Misra-Hebert testified that she discussed with Mr. Barbour his need to decrease his consumption of alcohol and the impact of alcohol on his health, she testified that she could not remember specifically telling Mr. Barbour of a "diagnosis" of alcohol abuse. (*Id*. at 14-15, 22.) Dr. Misra-Hebert testified that

---

[2] No claims are asserted against HRC. HRC is named as a defendant because proceeds of the policy would pay the Barbour's mortgage with HRC.

[3] Plaintiff also argued two other grounds in support her motion: (1) even if Mr. Barbour supplied a knowingly false statement in his application, his misstatement is not a warranty and HLIC's only remedy would be to cancel the policy (not deny plaintiff's already-existing claim for benefits); and (2) Mr. Barbour's non-disclosure of an "alcohol abuse" diagnosis did not render his response on his application untrue because the phrase "alcohol related condition" as used on the application is ambiguous and could rationally be interpreted as only referring to physical conditions related to alcohol while "alcohol abuse" itself refers to a mental condition.

– unlike the diagnosis of certain other conditions of which she would inform a patient (such as hypertension which requires the prescription of medication) – she considered the issue of a patient's alcohol use to be "a lifestyle habit" that she would have a "discussion" about with the patient. (*Id*. at 23.) She would not necessarily inform the patient of an "alcohol abuse" diagnosis.

After Dr. Misra-Hebert's deposition, HLIC offered to pay plaintiff's claim under the policy because Dr. Misra-Hebert's deposition revealed to HLIC for the first time that Mr. Barbour may not have been aware that he was diagnosed with alcohol abuse (thus, he did not fraudulently fail to disclose his diagnosis of an alcohol related condition). The parties have represented to the Court that they are in the process of settling plaintiff's breach of contract claim.

**Standard of Review**

Federal Rule of Civil Procedure 56 governs summary judgment and provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to "materials in the record," including depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no

genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1986).  In order to defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its position. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  In determining a motion for summary judgment, the non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255.

**Discussion**

*Defendants' Motion for Summary Judgment as to Bad Faith*

Under Ohio law, an insurer has a duty to act in good faith in the handling and payment of claims by insureds, and a breach of this duty gives rise to a cause of action in tort against the insured. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1316 (1983).  The Ohio Supreme Court stated the standard for analyzing a bad faith claim in *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552 (1994).  The Ohio Supreme Court held:  "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Id*.  In stating this standard, the Ohio Supreme Court expressly overruled its prior holding in *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690 (1992) that actual intent by the insurer to refuse to fulfill a contract with an insured is a requisite element of a bad faith claim. *Zoppo* held:  "actual intent is not an element of the tort of bad faith." *Zoppo*, 71 Ohio St. 3d at 554.

9

An insurer lacks reasonable justification when it denies an insurer's claim in an arbitrary and capricious manner. *Hoskins*, 452 N.E.2d at 1320; *Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711 (6th Cir. 1992). However, denial of a claim may be reasonably justified when "the claim was fairly debatable and the refusal is premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Tokles & Sons, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 630 (1992). *See also Corbo Properties, Ltd. v. Seneca Ins. Co., Inc.*, 771 F. Supp.2d 877, 880 (N.D. Ohio 2011) ("an 'arbitrary and capricious' denial is not reasonably justified; but a claim that is 'fairly debatable' would be reasonably justified.") "The test, therefore, is not whether the defendant's conclusion to deny benefits was correct, but whether the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial." *Thomas*, 974 F.2d at 711.

In *Zoppo,* the Ohio Supreme Court held that an insurer may not be reasonably justified in denying an insured's claim where the insurer fails to conduct an adequate investigation of the claim. *Zoppo* involved an insurance claim arising from a fire to an establishment the plaintiff owned. Following an investigation, the insurer denied the plaintiff's claim on the ground that there was sufficient evidence that the plaintiff participated in setting the fire and made material misrepresentations. The Ohio Supreme Court found that sufficient evidence of bad faith existed because the insurer's investigators ignored information during their investigation of the claim that tended to support the insured's claim (*i.e.*, public statements and other evidence indicating that individuals other than the plaintiff may have committed the fire). *See Zoppo*, 71 Ohio St.3d at 555-56. Instead, the insurer's investigators focused on evidence supporting the conclusion that the plaintiff was responsible for the fire despite

10

contrary evidence.

Defendants argue they are entitled to summary judgment on plaintiff's bad faith claim because, even though HLIC ultimately agreed to pay plaintiff's claim after Dr. Misra-Hebert's "unexpected" deposition testimony revealed that Mr. Barbour may not have been aware of his alcohol abuse diagnosis, HLIC's initial denial of plaintiff's claim for misrepresentation was reasonably justified in light of the information revealed in Mr. Barbour's medical records.  (Def. Mem. at 13-14.)  HLIC argues that the medical records HLIC obtained during its investigation demonstrated that Mr. Barbour had "an ongoing history of alcohol abuse" that was not disclosed by Mr. Barbour on the Barbour's insurance application and that HLIC reasonably believed on the basis of these records that "Mr. Barbour knew he had been diagnosed with alcohol abuse" but failed to disclose this material information on the Barbour's insurance application.  Defendants argue:

> Based on the Application and the medical records obtained during the investigation of the claim, HLIC had more that sufficient evidence to reasonably justify its conclusion that Mr. Barbour knowingly provided a false answer on the Application.  The medical records contained repeated diagnoses of an alcohol abuse condition, and his doctor "discussed at length" with Mr. Barbour the importance of quitting.  (*See* January 24, 2002 Notes; Dep. of Dr. Misra-Hebert).  Mr. Barbour admitted to drinking 12 beers per day for several years, and he answered yes to all four of the CAGE questions, which are commonly used to diagnose alcoholism.  (*Id*.)  There are recurring references throughout the medical records to discussions with Mr. Barbour about the need to reduce his alcohol consumption.  Given the extensive discussion with his doctor about alcoholism, and the extreme nature of his drinking – drinking 12 beers per day for several years– it appeared by all indications that Mr. Barbour's answers in the Application were willfully false.

(Def. Mem. at 16.)

Moreover, defendants contend that, contrary to the facts in *Zoppo*, HLIC conducted "a thorough and extensive investigation of Plaintiff's claim" during the claims handling process

11

and did not ignore any information favoring plaintiff's claim. (Def. Mem. at 11-12.) Rather, HLIC contends it acted in accordance with its standard procedures and conducted a timely and extensive claim review investigation, which uncovered an undisclosed risk material to its approval of the Barbour's policy.

Defendants contend they are entitled to summary judgment under the standard articulated by the Ohio Supreme Court in *Tokles & Sons, Inc. v. Midwestern Indem.*, 65 Ohio St. 3d 621, 630 (1992). The *Tokles* Court stated: "To grant a motion for summary judgment brought by an insurer on the issue of whether it lacked good faith in the satisfaction of an insured's claim, a court must find after viewing the evidence in a light most favorable to the insured, that the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Id.* Defendants contend the facts show that HLIC was reasonably justified in denying plaintiff's claim because it reasonably appeared to HLIC from Mr. Barbour's medical records that Mr. Barbour made a material misrepresentation on his application about his health history and HLIC acted in good faith in conducting its investigation. For purposes of assessing the bad faith claim, it does not matter that HLIC later discovered this determination to be incorrect.

Plaintiff opposes defendants' motion for summary judgment, arguing that a reasonable jury could conclude that HLIC lacked a reasonable justification for denying plaintiff's claim and that the issue of reasonable justification is for the jury to decide.[4] Plaintiff articulates four

---

[4]

Plaintiff first argues that HLIC relies on an "incorrect bad faith standard" in relying on cases that applied the "arbitrary and capricious" and "fairly debatable" tests in assessing whether an insurer acted in bad faith. According to plaintiff, these tests do not

12

reasons in support of this position.  First, plaintiff argues a reasonable jury could conclude that HLIC's investigation of plaintiff's claim was inadequate because HLIC failed to interview or attempt to interview Dr. Misra-Hebert to find out if she told Mr. Barbour that he had been diagnosed with "alcohol abuse- unspecified."  (Pltf. Opp. at 7.)  Plaintiff argues:

> The materiality of Dr. Misra-Hebert's information is demonstrated by HLIC's action after it took her deposition and she testified that she did not tell Larry that she had diagnosed him with alcohol abuse.  To its credit, HLIC recognized that its denial was wrong and rectified its mistake by agreeing to pay the contract claim.  However, this raises an obvious question.  If Dr. Misra-Hebert's testimony was so important, why didn't HLIC talk to her before it denied the claim?  A jury could find that a thorough claim investigation would have included doing so, and that, accordingly, HLIC's claim investigation was inadequate.

(Pltf. Opp. at 7-8.)

Second, plaintiff argues a reasonable jury could conclude that HLIC acted unreasonably because it accused Mr. Barbour of fraud on the basis of his response to an ambiguous question on the insurance application, namely, whether Mr. Barbour had ever been diagnosed with an "alcohol related condition."  Relying on Dr. Misra-Hebert's deposition testimony, plaintiff argues that a reasonable person could conclude that the phrase "alcohol related condition" refers to "what happens to end organs related to alcohol use," not simply to using excessive alcohol.  (Pltf. Opp. at 9-10.)  Plaintiff argues: "Given that the term 'alcohol

---

survive *Zoppo*.  Plaintiff asserts:  "*Zoppo* clearly endorsed [only] a single objective standard – reasonable justification"; therefore, the "use of any other standard is wrong." (Pltf. Opp. at 6.)  However, as Judge Boyko explained in *Corbo*, *Zoppo* overruled prior precedent only to the extent of overruling an "intent" element in insurer bad faith claims. The arbitrary and capricious and fairly debatable tests continue to apply in determining whether an insurer acted in bad faith after *Zoppo*.  *See Corbo*, 771 F. Supp.2d at 880-81. As Judge Boyko explained, use of the "fairly debatable" and "arbitrary and capricious" tests "are merely different ways of explaining and expressing the standard of 'reasonable justification'" endorsed in *Zoppo*.  *Id.* at 880.

13

related condition' is ambiguous, a jury could find that HLIC was not reasonably justified in accusing Larry of fraud based no his failure to disclose his diagnosis of alcohol use." (Pltf. Opp. at 10.)

Third, plaintiff argues that a reasonable jury could conclude that HLIC lacked reasonable justification to void the policy on the basis of Mr. Barbour's non-disclosure of his alcohol abuse diagnosis because HLIC discovered Mr. Barbour's diagnosis during the application process but still issued the policy. Plaintiff argues that a "jury could determine that HLIC was not reasonably justified in accusing Larry of fraud based on his failure to disclose his 'treatment' for alcohol abuse when, in fact, HLIC knew that he had had some type of treatment in his past" but HLIC chose not to more fully investigate the situation before issuing the policy. (Pltf. Opp. at 12.)[5]

Finally, plaintiff argues a reasonable jury could conclude that HLIC's investigation was inadequate because HLIC did not seek a legal opinion as to whether it had a right under Ohio law to void the Barbour's policy *ab initio* (and had HLIC done so, it would have discovered it did not have the right to void the policy). Plaintiff argues that HLIC's failure to consult legal counsel is "further evidence from which a jury could conclude that HLIC failed to conduct an adequate investigation before denying [plaintiff's] claim." (Pltf. Opp. at 13.)

---

[5] Instead, plaintiff argues that HLIC simply sent the Barbours the "a nebulous letter" asking them to "please advise if [they were] being treated for a medical condition other than high blood pressure." (Pltf. Opp. at 11.) Plaintiff argues: "HLIC could have been more specific in its inquiry, but chose not to be. It could have requested Larry's medical records from [the] Cleveland Clinic, but it chose not to do so. It could have inquired of Dr. Misra-Hebert, who was treating Larry's high blood pressure and whose name was disclosed on the application, but it did not do so. Instead, it issued the policy armed with the knowledge that there probably was some alcohol-related problem in Larry's past." (*Id.*)

HLIC denies in its reply brief that plaintiff's arguments are sufficient to raise a genuine issue for trial on the bad faith claim.  It argues in its reply brief, as it did it in opening brief, that its investigation was thorough and adequate.  HLIC emphasizes that, unlike in *Zoppo* and another case where an insurer's investigation was found to be inadequate (*Great West. Cas. Co. v. Flandrich*, 605 F. Supp.2d 955 (S.D. Ohio 2009)), HLIC did not "ignore" any information that tended to support plaintiff's claim.[6]  In addition, HLIC denies that its investigation was inadequate because it relied on medical records information and did not expand its claim investigation to include interviewing Dr. Misra-Hebert.  HLIC points out that plaintiff has cited no authority supporting a requirement that an insurer must interview a treating physician in order "to confirm medical records information" and argues that such a requirement would be unreasonable.

Furthermore, HLIC argues that even if the question on the application asking Mr. Barbour whether he had been treated for an "alcohol related condition" was ambiguous, the issue to be determined is whether HLIC's denial of plaintiff's claim was reasonably justified.  HLIC argues that is was reasonably justified in believing that Mr. Barbour should have disclosed his medical history of a 12-beer-per-day drinking problem and a diagnosis of

---

[6]

In this regard, HLIC denies plaintiff's contention that it "knew" from the MIB query that Mr. Barbour had an alcohol related problem, asserting in its reply brief (as it explained in its opening brief) that "the MIB results were only a 'try,' meaning that the information HLIC received was unconfirmed and there were multiple reasons to expect that such information may not be accurate or even be related to Mr. Barbour."  (Def. Rep. at 6.)  Plaintiff has not countered HLIC's evidence that MIB results were only unconfirmed, suspected information and that MIB's policy and privacy concerns prevented HLIC from asking plaintiff a more specific question about his alcohol use after receiving the MIB try.  HLIC asserts that it was reasonably justified in "taking Mr. Barbour at his word" when he responded to HLIC's May 5, 2008 letter that he was not being treated for any medical condition other than high blood pressure.

15

alcohol abuse on the Barbour's insurance application – either in response to the application's question of whether Mr. Barbour was being treated for an "alcohol related condition" or in response to the question of whether he had ever been told that he suffered from a "mental" disease or disorder.

Finally, HLIC asserts that it was reasonably justified in considering Mr. Barbour's representations to be a warranty incorporated into the policy such that voiding the policy was legally permitted. However, HLIC asserts that, even assuming a genuine dispute exists as to the interpretation of the policy in this regard, this does not equate to bad faith on the part of HLIC. HLIC asserts: "Ohio courts have held that even where the Court rules against an insurer on an issue of contract interpretation, summary judgment is still appropriate where there is a genuine dispute as to the law interpreting the contract." (Def. Rep. at 8, *citing Nationwide Mut. Ins. Co. v. Robb*, Case No 17115, 199183, at \*4 (Ohio App., April 24, 1996).

Defendants' motion for summary judgment on plaintiff's bad faith claim is well-taken. Defendants' argument is persuasive that it was reasonable for HLIC to conclude, on the basis of Mr. Barbour's medical records obtained in HLIC's claim review investigation (which indicate on their face that Dr. Misra-Hebert diagnosed Mr. Barbour multiple times with "alcohol abuse- unspecified"), that Mr. Barbour intentionally failed to disclose his alcohol abuse diagnosis on his insurance application.

Plaintiff's arguments are not sufficient to demonstrate that HLIC was not "reasonably justified" in denying plaintiff's claim. Even though plaintiff points out that HLIC had the ability to do more to determine definitively whether Mr. Barbour had in fact been treated for

16

an alcohol related condition by interviewing Dr. Misra-Hebert before it issued the policy and before it denied plaintiff's claim but did not do so,[7] plaintiff does not cite any case indicating that an insurer acts in bad faith when it fails to interview a treating physician to confirm information disclosed on a patient's insurance application or medical records.  As stated above, based on the information HLIC had before it – obtained and reviewed by HLIC in accordance with its HLIC's standard procedures –  it was reasonable for HLIC to conclude that Mr. Barbour made willfully false representations about his health history on his insurance application.  That HLIC's determination turned out to be incorrect does not demonstrate that HLIC acted in bad faith.

Furthermore, defendants persuasively argue that *Zoppo* and other cases finding an insurer's investigation to be inadequate are distinguishable because the insurers in those cases "ignored" information that tended to support the plaintiffs' claims.  *See, e.g., Zoppo*, 71 Ohio St. 3d at 555-56 (insurer's investigators did not seriously explore evidence and leads that someone other than plaintiff set the fire).[8]  Here, HLIC cannot be said to have similarly "ignored" information.  As discussed above, HLIC did not seek to *confirm* information it

---

[7]

It is undisputed that HLIC had authorization to discuss Mr. Barbour's health history with Dr. Misra-Hebert at any time.

[8]

*Metropolitan Life Ins. Co. v. Conger*, 474 F.3d 258 (6th Cir. 2007), an ERISA case cited by plaintiff, is also distinguishable on this basis.  The Sixth Circuit held in *Metropolitan* that an insurer abused its discretion by rescinding a group long-term care insurance policy based on an insured's "no" answer to a question about whether he had been diagnosed with or treated for a "progressive neurological disorder, finding that "the administrator, in reviewing the insured's medical records, focused on slivers of information that could be reason to support a denial of coverage and ignored– without explanation– a wealth of evidence that directly contradicted its basis for denying coverage." *Id*. at 265.

17

obtained during the underwriting stage (*i.e.*, the MIB try) suggesting that Mr. Barbour had been treated in his past for alcohol abuse by interviewing his physician and did not seek to interview his physician before denying plaintiff's claim to verify that Mr. Barbour knew of his alcohol abuse diagnosis. But this is not the equivalent of ignoring information tending to support an insured's claim (and, as discussed above, plaintiff has not submitted authority suggesting that in order to act in good faith, an insurer must go beyond a medical records review and interview an applicant's treating physician). Hence, plaintiff has not demonstrated that HLIC conducted an inadequate investigation in failing to seek out information beyond Mr. Barbour's medical records.

Finally, plaintiff's argument lacks merit that HLIC failed to conduct an adequate investigation because it failed to consult legal counsel before finding plaintiff's policy void on the basis of Mr. Barbour's purported misrepresentations. Plaintiff cites no authority that an insurer acts in "bad faith" in failing to consult legal counsel before making a contract determination.

In sum, plaintiff's arguments are insufficient to show that HLIC had no reasonable justification for refusing plaintiff's claim, which is the burden plaintiff bears in order to withstand summary judgment on her bad faith claim. *See Hartford Ins. Co. of the Midwest v. Cleveland Public Library*, Case No. 1: 99 CV 1701, 2001 LEXIS 31494, at *8 (N.D. Ohio Feb. 9, 2004) ("to withstand a motion for summary judgment, an insured must oppose . . . [the] motion with evidence which tends to show that the insurer had no reasonable justification for refusing the claim."). Although HLIC could have done more to verify whether Mr. Barbour fraudulently failed to disclose an alcohol related condition before it

18

denied plaintiff's claim, good faith requires only that the insurer have a "reasonable justification" for its decision. It does not require an insurer to seek all information to ensure a correct decision. The undisputed evidence shows that HLIC had a "reasonable justification" for its coverage decision and did not ignore any information tending to support plaintiff's claim.

**Conclusion**

For the reasons stated above, defendants' motion for summary judgment on plaintiff's bad faith claim is granted.

IT IS SO ORDERED.

    /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 4/2/12